IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VALERIE WILLIAMS PARHAM,  )
    Plaintiff,  )
                       )
        v.  )     CIVIL NO. 3:12cv720(REP)
                       )
CAROLYN W. COLVIN,  )
Commissioner of Social Security,  )
    Defendant.  )
_____  )

## REPORT AND RECOMMENDATION

Valerie Williams Parham ("Plaintiff") is 51 years old and previously worked as a

certified nursing assistant, housekeeper and shipping/receiving clerk. On August 15, 2005,

Plaintiff protectively applied for Social Security Disability ("DIB") under the Social Security

Act, claiming disability due to hepatitis C, high blood pressure, thyroid disease, carpal tunnel

syndrome, nerve damage in both hands and depression, since the amended onset date of

December 12, 2007. Plaintiff, represented by counsel, presented her claim to an ALJ, who

denied Plaintiff's requests for benefits. The Appeals Council subsequently denied Plaintiff's

request for review on August 20, 2012, making the ALJ's decision a final decision of the

Commissioner of Social Security.

Plaintiff, now proceeding *pro se*, presents new evidence to the Court and challenges the

ALJ's decision that Plaintiff was not disabled during the relevant time period. Plaintiff seeks

judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties

have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having

reviewed the parties' submissions and the entire record in this case, the Court is now prepared to

issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that

follow, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF

No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be

GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I.  BACKGROUND

Plaintiff challenges the ALJ's determination that she maintained the residual functional

capacity ("RFC") to perform limited sedentary work after December 12, 2007, and was not

disabled. Therefore, Plaintiff's educational and work history, Plaintiff's medical history from

the relevant time period, consulting physicians' opinions, Plaintiff's reported activities of daily

living, non-treating physicians' opinions and Plaintiff's testimony are summarized below.

### A.  Education and Work History

Plaintiff is 51 years old, completed high school and attended two years of college. (R. at

229.) In 1985, Plaintiff attended a geriatric nursing program and earned her certified nursing

assistant certificate. (R. at 229.) Plaintiff previously worked as a certified nursing assistant and

receiving clerk. (R at 225.) As a certified nursing assistant, Plaintiff cared daily for elderly

women, which included dressing, feeding and bathing her patients. (R. at 225.) More recently

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D.
Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration
of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information
to only the extent necessary to properly analyze the case.

Plaintiff worked as a housekeeper and certified nursing assistant until 2005, when her condition prevented her from working. (R. at 224-25.)

B. Medical Records

From January 12, 2005 until July 21, 2005, Plaintiff underwent clinical treatment for hepatitis C from Mitchell L. Shiffman, M.D., by way of a research study. (R. at 289-91.) On August 25, 2005, Plaintiff sought an evaluation from Julia R. Nunley, M.D., who indicated that Plaintiff suffered from hepatitis C and her hepatitis treatment caused hair loss. (R. at 303-04.) On September 19, 2005, Plaintiff underwent an EMG, from which Timothy Marqueen, M.D., diagnosed Plaintiff with bilateral carpal tunnel syndrome and left DeQuervain's tenosynovitis. (R. at 301.) Dr. Marqueen indicated that it was difficult to discern the cause of Plaintiff's pain, because of her history of liver disease and interferon treatment. (R. at 301.) He administered injections and noted that Plaintiff sustained the treatment without difficulty. (R. at 301.)

Plaintiff was under the care of Charles City Medical Group and Inja H. Chang, M.D., during the time of her amended onset date of disability, December 12, 2007. (R. at 306-337.) During Plaintiff's December 28, 2007 appointment, Dr. Chang listed Plaintiff's conditions as hepatitis C, hypertension, carpal tunnel syndrome and hyperthyroidism. (R. at 316.) Plaintiff complained of pain in both hands and indicated that she could not work because of her carpal tunnel syndrome. (R. at 316.) On February 12, 2008, Plaintiff described ongoing pain in both legs, depression and hair loss. (R. at 315.) She received oxycodone on February 27, 2008. (R. at 315.) Plaintiff attended a follow-up appointment on March 14, 2008, during which Dr. Chang refilled Plaintiff's medications and indicated that Plaintiff's conditions included alopecia. (R. at 333.) Plaintiff noted that she did "not feel well" and ached all over. (R. at 333.) Her depression

caused difficulty in getting out of bed and she suffered from suicidal thoughts occasionally. (R. at 333.)

During Plaintiff's April 15, 2008 appointment, Plaintiff received refills for her pain medications. (R. at 332.) She complained of pain in both of her wrists and elbows, but indicated that she felt much better. (R. at 332.) On May 29, 2008, Plaintiff underwent hepatologist testing, which showed that Plaintiff's condition was stable. (R. at 331.) She experienced pain in both of her hands and wrists and in her left elbow. (R. at 331.) During Plaintiff's July 7, 2008 appointment, Plaintiff indicated that she was depressed and complained of wrist pain. (R. at 330.) On August 20, 2008, Dr. Chang noted tenderness in Plaintiff's wrists, but Plaintiff refused to undergo surgery for her carpal tunnel. (R. at 329.) Plaintiff's medication caused an upset stomach, but Celexa helped her mood. (R. at 329.) On October 2, 2008, Plaintiff complained of right arm and shoulder pain. (R. at 328.)

During Plaintiff's November 12, 2008 appointment, Plaintiff cited pain in her upper arms, shoulders and elbows. (R. at 336.) On December 8, 2008, Plaintiff experienced pain in her joints that occurred mostly in her upper extremities. (R. at 335.) She underwent hepatitis C treatment and received refills for her pain medications. (R. at 335.) Plaintiff's mood was depressed during her January 16, 2009 appointment and she complained of shoulder and elbow pain. (R. at 334.) Dr. Chang noted shoulder and elbow tenderness. (R.at 334.) On April 8, 2009, Plaintiff experienced right shoulder tenderness and Dr. Chang refilled her prescriptions. (R. at 360.) On April 17, 2009, Plaintiff complained of ongoing right arm pain. (R. at 359.) Plaintiff visited Dr. Chang to discuss her lab work on April 21, 2009. (R. at 358.) Plaintiff admitted that she used cocaine. (R. at 358.) Dr. Chang counseled Plaintiff to stop using drugs and indicated "no more Percocet" in Plaintiff's treatment notes. (R. at 358.)

4

On September 18, 2009, Bolling Feild, M.D., examined Plaintiff and indicated that Plaintiff suffered from hepatitis C, high blood pressure, thyroid disease, carpal tunnel syndrome, anxiety and depression. (R. at 397.) Plaintiff complained that the pain in her hands, arms and shoulders bothered her most, that she felt pain all of the time since 2005, but that it was increased by physical activities. (R. at 397.) Plaintiff denied leg pain, except for occasional pain in her left foot which she attributed to a fracture that occurred in 2007. (R. at 397.) She indicated that her arms and hands tingled and that she experienced problems with her handgrip. (R. at 397.) Dr. Feild noted that these symptoms were consistent with carpal tunnel syndrome. (R. at 398.)

Plaintiff reported that she felt depressed since 2002 and that she took Celexa each day to treat her depression. (R. at 398.) She felt tired all of the time and could not sleep at night. (R. at 398.) In the two months before the examination, Plaintiff lost about ten pounds. (R. at 398.) She indicated that she was separated from her husband and had one child. (R. at 399.) She stated that did not smoke and had not used alcohol since 1999. (R. at 399.)

During the physical examination, Dr. Feild noted tenderness in Plaintiff's hands, arms, shoulders and fingers. (R. at 399.) She maintained a mildly weakened grip, which Dr. Feild measured at 4/5, but she could make a fist. (R. at 399.) She suffered no tenderness in her legs. (R. at 399.) Plaintiff exhibited no difficulty in getting on and off Dr. Feild's examination table. (R. at 400.)

Dr. Feild diagnosed Plaintiff with moderately severe bilateral carpal tunnel syndrome in both arms and hands, for which she refused to undergo surgery to correct, hepatitis C, chronic depression, controlled hypertension and hypothyroidism, which was treated with medication. (R. at 400.) He noted that Plaintiff experienced a significant problem with her fatigue and depression, and indicated that her depression could have stemmed from her hepatitis C. (R. at

400.) Dr. Feild explained that Plaintiff's symptoms were consistent with the lab findings. (R. at 400.) He opined that Plaintiff maintained the ability to walk or stand four hours during an eight-hour workday with normal breaks and sit for less than four hours in an eight-hour workday. (R. at 400-01.) Plaintiff needed no assistive device and could not lift or carry, handle, feel, grasp or finger. (R. at 401.)

In an addendum to his report, Dr. Feild explained that Plaintiff suffered no decreased range of motion in her shoulders, elbows, wrists, hands or fingers. (R. at 405.) He also opined that Plaintiff could stand or walk and sit for six to eight hours during a normal workday. (R. at 405.) Dr. Feild further noted that Plaintiff maintained the ability to lift ten pounds occasionally, but could not lift any weight frequently. (R. at 405.) In his opinion, Plaintiff's fatigue and depression could interfere with Plaintiff's work activities. (R. at 405.)

On July 21, 2009, Plaintiff underwent a Mental Status Evaluation by Demetria Brown, Psy.D., which Dr. Brown adopted and incorporated into her Mental Status Addendum on March 21, 2009, to account for Plaintiff testing positive for drug use. (R. at 384-91.) During the evaluation, Plaintiff was cooperative, motivated and exhibited labored breathing. (R. at 385.) Plaintiff indicated that she suffered from depression for which she took medication, but that she could not pay to seek treatment and that her condition required her to carry bleach everywhere. (R. at 384-85.) In describing her day, Plaintiff noted that she slept all day and got up at 9 a.m. to take medication before she returned to sleep for two or three more hours. (R. at 386.) She tried to eat, but had little appetite. (R. at 386.) Plaintiff could not function socially, because she could not control her bowel or bladder. (R. at 386.) Plaintiff's daughter attempted to get Plaintiff out of the house, but she refused because she did not like people looking at her hair and face. (R. at 386-87.)

Plaintiff listed her activities as going to church, but did not go shopping, because she feared having an accident. (R. at 387.) Plaintiff was tearful in accounting these events. (R. at 387.) Her disability affected her ability to walk, stand and bend, and she walked with a cane for only short distances due to an incident where she broke her foot. (R. at 387.) Plaintiff recalled an occasion when she was raped in the early 1990's and she believed that she contracted hepatitis C from this incident. (R. at 387.) Plaintiff denied any history of substance use, but Dr. Brown indicated that Plaintiff was currently using cocaine. (R. at 387.)

During the examination, Plaintiff appeared cooperative, felt overwhelmed, demonstrated a congruent affect for the life experiences and fought back tears when discussing the rape and end of her marriage. (R. at 388.) While Plaintiff indicated that she was forgetful, Dr. Brown noticed that Plaintiff demonstrated good personal hygiene and wore age appropriate clothing. (R. at 388.) Dr. Brown noted that Plaintiff's recollection of events was consistent with that of a person of at least average intelligence. (R. at 388.) However, Plaintiff could not recall four unrelated words after thirty minutes and could not count backwards from 100 in increments of thirds. (R. at 389.) Plaintiff indicated that she experienced suicidal ideations for which she took medication. (R. at 388.) However, she indicated that she could not kill herself for fear of going to hell. (R. at 388.) Plaintiff denied experiencing any hallucinations, delusions, paranoia, obsessive compulsions or phobias. (R. at 388.) Plaintiff focused on her pain throughout the appointment and there was no indication of a psychotic episode. (R. at 388.)

Dr. Brown diagnosed Plaintiff with recurrent major depressive disorder, cocaine abuse, hepatitis C, hypertension, thyroid disease and carpal tunnel syndrome, and assessed that Plaintiff

maintained a Global Assessment of Functioning[2] ("GAF") of 55.[3] (R. at 389.) Dr. Brown noted

that Plaintiff's statements were credible, as they were consistent with her appearance and the

record, and that Plaintiff's prognosis appeared poor. (R. at 390.) In Dr. Brown's opinion,

Plaintiff was capable of performing simple and complex tasks, but she could not physically

perform work-related tasks or complete a normal workday without interruptions. (R. at 390-91.)

Dr. Brown further opined that Plaintiff's medical condition caused Plaintiff to exhibit a mean

affect and incontinence that would keep Plaintiff from interacting appropriately with co-workers

and the public and handle stressors. (R. at 391.) Dr. Brown assessed that Plaintiff's abilities

were markedly limited and her drug use further hindered Plaintiff's abilities. (R. at 391.)

On December 6, 2010, Renee Heylinger, Psy.D., completed a mental work capacity

evaluation on behalf of Plaintiff, indicating that she had seen Plaintiff only four times at that

point. (R. at 461.) Dr. Heylinger stated that she last saw Plaintiff on October 25, 2010, as

Plaintiff missed her November 11, 2010 appointment and Plaintiff had not rescheduled the

appointment as of the time of the evaluation. (R. at 461.) Dr. Heylinger noted that Plaintiff

experienced anxiety and depression that affected her concentration and short term memory. (R.

at 461.) Plaintiff denied any substance or alcohol use. (R. at 463.)

Dr. Heylinger opined that Plaintiff was slightly limited in her ability to remember

locations and work-like procedures, as well as understanding and remembering short and simple

instructions. (R. at 461.) Plaintiff exhibited a slight limitation in her ability to: (1) carry out

short and simple instructions, (2) perform activities within a schedule, (3) sustain an ordinary

---

2       The Global Assessment of Functioning ("GAF") is a 100-point scale that rates
"psychological, social, and occupational functioning." Diagnostic Statistical Manual of Mental
Disorders, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter "DSM-IV").

3       A GAF of 51-60 is defined as "[m]oderate symptoms (*e.g.*, flat affect and
circumstantial speech, occasional panic attacks) OR difficulty in social, occupational, or school
functioning (*e.g.*, few friends, conflicts with peers or co-workers)." DSM-IV at 34.

routine without supervision, (4) maintain regular attendance and be punctual, (5) interact appropriately with the general public and (6) ask simple questions. (R. at 462.) Plaintiff was moderately limited in her ability to: (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods of time, (3) work in coordination with others or in the proximity of others without being distracted by them, (4) make simple work-related decisions and accept instructions, (5) respond appropriately to criticism from supervisors, (6) respond appropriately to changes in the work setting and (7) set realistic goals or make plans independently of others. (R. at 462-63.) Dr. Heylinger noted that Plaintiff was markedly limited in her ability to: (1) get along with co-workers or peers without distracting them or exhibiting extreme behavior extremes, (2) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (3) understand and remember detailed instructions. (R. at 461-62.) Dr. Heylinger found no limitations in Plaintiff's ability to be aware of normal hazards and take appropriate precautions or travel to unfamiliar places or use public transportation. (R. at 463.)

According to Dr. Heylinger, Plaintiff could manage benefits in her best interest. (R. at 463.) Plaintiff could not sustain work activity five days a week, eight hours a day, fifty-two weeks a year due to her mood and anxiety. (R. at 463.) However, Dr. Heylinger determined that Plaintiff's condition was treatable, but Plaintiff failed to comply with her therapy appointments. (R. at 463.)

Plaintiff returned to treatment with Dr. Heylinger during an appointment on January 3, 2001. (R. at 469.) Plaintiff appeared sad and tearful. (R. at 469.) She indicated that she was fighting with her sister and was tired of being sick. (R. at 469.) Dr. Heylinger noted that Plaintiff's treatment compliance was fair. (R. at 469.) On January 17, 2011, Plaintiff reported

9

not feeling well, indicating that she was physically achy. (R. at 468.) Plaintiff appeared less depressed and maintained hope that things would turn around for her. (R. at 468.) However, Plaintiff's treatment compliance remained fair. (R. at 468.) During Plaintiff's February 21, 2011 appointment, Plaintiff exhibited grief stemming from her grandmother's death and Dr. Heylinger discussed methods of reducing anxiety and panic attacks. (R. at 467.)

Attached to Plaintiff's Motion for Summary Judgment, Plaintiff provided a medical absence report and an updated disability assessment in support of her position for an award of benefits. (Pl.'s Mem. at Ex. 1.) On October 31, 2012, Plaintiff sought treatment from Karen Hearst, M.D., for pain and depression. (Pl.'s Mem. at Ex. 1.) This was Plaintiff's first appointment with Dr. Hearst. (Pl.'s Mem. at Ex. 1.) Dr. Hearst listed Plaintiff's only restriction as no prolonged walking or standing. (Pl.'s Mem. at Ex. 1.) Plaintiff also provided a Medical Absence Report from Lerla Joseph, M.D., dated February 27, 2006. (Pl.'s Mem. at Ex. 1.) Dr. Joseph ordered that Plaintiff never to return to work and noted that Plaintiff "is permanently and totally disabled." (Pl.'s Mem. at Ex. 1.)

C.       Non-treating State Agency Physicians

On August 6, 2009, Stephen Saxby, state agency psychologist, reviewed Plaintiff's records and performed a mental residual capacity assessment of Plaintiff's condition. (R. at 92.) He opined that Plaintiff was not significantly limited in her ability to: (1) carry out very short simple instructions, (2) carry out detailed instructions, (3) make simple work-related decisions, (4) interact appropriately with the general public and (5) ask simple questions or request assistance. (R. at 92-93.) He determined that Plaintiff suffered no understanding and memory limitations. (R. at 92.) Plaintiff suffered moderate limitations in her ability to: (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, (3)

maintain regular attendance and be punctual within customary tolerances, (4) sustain an ordinary routine without special supervision, (5) work in coordination with or in proximity to others without being distracted by them and (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 92.) Dr. Saxby indicated that Plaintiff's drug use may contribute to Plaintiff's mood swings and would create social interaction problems. (R. at 92.) Plaintiff also experienced moderate limitations in her ability to: (1) accept instructions and respond appropriately to criticism from supervisors, (2) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (3) maintain socially appropriate behavior and (4) adhere to basic standards of neatness and cleanliness. (R. at 93.)

On March 12, 2012, Eric Oritt, Ph.D., a state agency psychologist, performed a mental residual capacity assessment of Plaintiff's condition after he reviewed the record, in which he offered his opinions regarding Plaintiff's limitations which were wholly consistent with Dr. Saxby's opinions. (R. at 125-126.)

On September 21, 2009, Robert Chaplin, a state agency medical consultant, reviewed Plaintiff's records and completed a residual functional capacity assessment of Plaintiff's condition. (R. at 90.) Dr. Chaplin opined that Plaintiff maintained the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand or walk and sit with normal breaks for about six hours in an eight-hour work day. (R. at 90.) Plaintiff was not restricted in her ability to push and/or pull. (R. at 90.) Dr. Chaplin indicated that Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and could occasionally climb ladders, ropes or scaffolds. (R. at 90.) Plaintiff was limited in her ability to reach right

overhead, but was unlimited in her ability to handle, finger or feel. (R. at 91.) According to Dr. Chaplin, Plaintiff should avoid concentrated exposure to extreme heat, humidity and fumes, odors, dusts, gases and poor ventilation. (R. at 91.)

On March 11, 2010, Luc Vinh, M.D., a state agency medical consultant completed a physical residual function capacity assessment of Plaintiff's abilities after reviewing the record. (R. at 123-25.) Dr. Vinh opined that Plaintiff maintained the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand or walk and sit with normal breaks for about six hours in an eight-hour work day. (R. at 123.) Plaintiff was not restricted in her ability to push and/or pull. (R. at 123.) Dr. Vinh determined that Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and could occasionally climb ladders, ropes or scaffolds. (R. at 124.) Plaintiff was limited in her ability to reach right overhead, but was unlimited in her ability to handle, finger or feel. (R. at 124-25.) Dr. Vinh indicated no environmental limitations.

D.     Plaintiff's Testimony

Plaintiff testified, while represented by counsel, at a hearing before an ALJ on March 1, 2011, and indicated that she was married and lived with her husband, who was retired. (R. at 29, 37-38.) Plaintiff did not have a valid driver's license, because she lost it after receiving a citation for driving under the influence. (R. at 38.)

Plaintiff stated that she could not reach with her right arm, because of shoulder problems that stemmed from arthritis and her hepatitis treatment. (R. at 38-39.) Plaintiff wore wrist braces prescribed by an orthopedic doctor on both arms at night. (R. at 39.) Plaintiff treated her shoulder pain with cortisone shots and steroid injections, which provided no relief. (R. at 40.) She sought pain management and estimated that the pain level in her right shoulder was about a

five and half and her right wrist pain was a four on a scale of one to ten. (R. at 41.) While seated, Plaintiff indicated that she had to get up about three or four times an hour and could stand for about 10-15 minutes at a time due to pain in her right shoulder and right leg. (R. at 42-43.) Plaintiff experienced numbness and tingling in her toes. (R. at 61.) Her counsel conceded that no medical records document treatment to Plaintiff's right leg. (R. at 42.) Plaintiff indicated that she took Lorazepam and levothyroxine, which caused side effects including dry mouth, diarrhea and an upset stomach. (R. at 44.) She visited her doctor on a monthly basis. (R. at 44.) Plaintiff testified that she suffered asthma for her entire life, which she treated with a nebulizer in the winter and an inhaler. (R. at 56.) Plaintiff admitted that she smoked cigarettes during the wintertime. (R. at 56.) Her asthma caused her to miss days of work while she was employed at a factory. (R. at 56-57.)

Plaintiff described that she could not lift or carry anything with her left hand after an accident during which she scalded herself while taking a pot off of the stove. (R. at 43.) She could lift her purse, which weighed about five pounds. (R. at 43.) Plaintiff could dress herself sometimes and indicated that she needed help putting on her top clothes and socks. (R. at 45.) She also needed help bathing. (R. at 46.) Plaintiff's husband cleaned her house. (R. at 52.) On a typical day, Plaintiff stated that she woke up, took her medicine and then bathed and fixed her hair if she was able. (R. at 58.) She stayed in the house on most days, unless she had a doctor's appointment, because going out overwhelmed her. (R. at 58.)

Plaintiff saw a psychiatrist, Dr. Heylinger, who prescribed Lorazepam and Celexa for Plaintiff. (R. at 47.) Plaintiff testified that she experienced memory disturbance and that her husband handled her checkbook and mail, but if her husband could no longer handle her bills, Plaintiff could most likely do it on her own. (R. at 48, 59.) She stated that she watched

television including the Animal Channel, the Discovery Channel and Lifetime. (R. at 49.) Plaintiff could follow the plot of the television stories and could follow the sermon at church. (R. at 49.) During church services, Plaintiff had to get up several times and, during the day, she took about 10-15 bathroom breaks. (R. at 50.) Plaintiff stated that she had not had any alcohol since 2005, after she suffered a history of drinking. (R. at 51.) She admitted to past cocaine use. (R. at 51.)

      E.      Function Report Questionnaire

On March 26, 2009, Plaintiff completed a Function Report Questionnaire that provided that she lived with her husband and that her daughter would be moving in with her. (R. at 241-51.) Plaintiff spent her days taking her medication and then cleaning and cooking when she was able to do so. (R. at 242.) She described that most days she slept because of her medications and because she had no other business to address. (R. at 242.) Plaintiff did not care for anyone else or her pets. (R. at 243.) Plaintiff's daughter helped Plaintiff three times each week with cooking, cleaning and bathing. (R. at 243.)

Plaintiff indicated that before her disability, she worked, cooked and cleaned without help. (R. at 243.) Her condition affected her sleep and Plaintiff noted that there was little medication that she could take to ease the pain due to her hepatitis C. (R. at 243.) Plaintiff needed help to dress, bathe and use the toilet, because she experienced arm stiffness and swelling. (R. at 243.) She needed no reminder to take care of her personal needs, but needed reminders to take her medications. (R. at 244.) Her husband provided her with her medication every day and night to ensure that she took it at the same time. (R. at 244.) Plaintiff noted that she did not prepare her own meals and that her husband and daughter cooked for her, because she caused too many accidents from leaving the stove on, which once caused a fire. (R. at 244.)

Plaintiff used to cook before the fire. (R. at 244.) Plaintiff indicated that she did laundry once a week and vacuumed three times per week. (R. at 244.) Sometimes, her husband helped her finish these tasks. (R. at 244.) She never performed yard work because of her asthma. (R. at 245.)

Plaintiff reported that she only went out to go to the doctors and that she did not like being around other people, because she was paranoid. (R. at 245.) When Plaintiff went out, she used public transportation or rode in a car. (R. at 245.) Plaintiff indicated that she could not go out alone and could not drive, because she did not have a license. (R. at 245.) She shopped in stores, by phone or by mail for groceries and medications on a monthly basis. (R. at 245.) Plaintiff marked that she could count change, but she cannot pay bills, handle a savings account or use a checkbook; her daughter handled her accounts. (R. at 245.) Since developing her condition, Plaintiff noted that her ability to handle money changed and that she over-drafted her account when she paid bills twice or forgot to pay bills. (R. at 246.)

Plaintiff listed her hobbies as watching television and puzzles. (R. at 246.) She watched television daily, but had not completed a puzzle since 2007. (R. at 246.) Plaintiff spent time with others talking, watching movies and having dinner. (R. at 246.) Her family and neighbors visited about three times a month and Plaintiff went to church on a regular basis. (R. at 246.) Plaintiff noted that she needed reminders to go places and went out about twice a month, but she needed someone to accompany her. (R. at 246.) Plaintiff sometimes has difficulty getting along with her family. (R. at 247.) Since the onset of her disability, Plaintiff stayed in her house and isolated herself, which she attributed to her depression. (R. at 247.)

Plaintiff marked that her condition affected her ability to lift, reach, walk, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands and get along with

others. (R. at 247.) However, her condition did not affect her ability to squat, bend, stand, sit, kneel, talk, hear or climb stairs. (R. at 247.) Plaintiff could not pay attention for very long and indicated that she was fair at following written instructions and poor at following spoken instructions. (R. at 247.) She experienced no problems getting along with authority figures and was never fired from a job for failing to get along with others. (R. at 248.) Plaintiff could not handle stress, suffered from panic attacks and was "fair" at handling changes in her routine. (R. at 248.) Plaintiff noted that she suffered from a fear that her condition is getting worse and that cutting off her arms would be the only way in which she could achieve relief from the pain. (R. at 248.) Plaintiff walked with a cane since 2008 and slept in a splint since 2005, prescribed by her doctors. (R. at 248.)

That same day, Plaintiff completed a pain report in which she indicated that she felt pain in her hands, wrists, arms, shoulders and neck. (R. at 250.) Plaintiff also suffered pain in her left foot and leg from when she broke her foot in 2008. (R. at 250.) She described her pain as aching, stabbing, burning and throbbing, and indicated that she experienced pain all day, every day. (R. at 250.) The use of her hands worsened the pain. (R. at 250.) The pain affected Plaintiff's activities since August 2005 and affected her ability to do simple tasks like bathing and writing. (R. at 251.) Plaintiff took ibuprofen and oxycodone for the pain, but she indicated that it no longer helped and caused dry mouth, nausea, an upset stomach and dizziness. (R. at 251.)

F.      Third Party Function Report

On June 10, 2009, Plaintiff's sister, Vanessa Brown, submitted a third party function report in which she indicated that she seldom visited Plaintiff, as most of their time together resulted in arguments. (R. at 253.) According to Ms. Brown, Plaintiff lived with her husband

16

and they shared the responsibilities of taking care of their dog daily. (R. at 254.) Ms. Brown indicated that there was nothing that Plaintiff could do before her illness that she was unable to do now. (R. at 255.) However, Plaintiff's condition affected her ability to sleep — she slept all day and spent her nights awake. (R. at 255.)

Ms. Brown noted that Plaintiff had no difficulty in tending to her own personal care and she needed no reminders to do so. (R. at 255-56.) Plaintiff prepared her own meals daily including "southern style complete meals." (R. at 256.) Plaintiff also maintained a "well-kept home" and performed chores regularly without the need for encouragement. (R. at 256-57.) Ms. Brown noted that Plaintiff went out daily by riding in a car and walking. (R. at 257.) Plaintiff could not drive, because her license was revoked on the basis of driving under the influence offenses. (R. at 257.) Plaintiff shopped in stores and by telephone, and could pay bills, count change, handle a savings account and use a checkbook. (R. at 258.)

Ms. Brown listed Plaintiff's hobbies as "drinking, cussing and fussing" and noted that Plaintiff did this on a daily basis. (R. at 258.) Ms. Brown indicated that this "has gotten worse over the years." (R. at 258.) Plaintiff spent time with others daily and went out every weekend to "shot houses." (R. at 259.) Ms. Brown marked that Plaintiff had difficulty with others, because she is mean. (R. at 259.) This is the only activity that Ms. Brown noted to be affected by Plaintiff's disability. (R. at 259.)

Plaintiff could mostly pay attention for short time spans and could finish what she started (R. at 260.) Ms. Brown indicated that Plaintiff was good at following written instructions, but she never followed spoken instructions "if it is not in her benefit." (R. at 260.) Plaintiff struggled to get along with authority figures and Ms. Brown described Plaintiff as "very disrespectful." (R. at 260.) Ms. Brown noted that Plaintiff was fired from the Southside Virginia

Training Center and Petersburg Home for Ladies, because of her problem getting along with others. (R. at 260.) She also alluded to Plaintiff's mean demeanor and noted that Plaintiff had always been mean. (R. at 254-55, 259-60, 262.) Ms. Brown attributed Plaintiff's mood swings to Plaintiff's drinking and possible drug use. (R. at 256.) Plaintiff could not handle stress and handled changes in routine "okay." (R. at 261.)

On April 21, 2011, after the ALJ issued an opinion denying Plaintiff's claim for benefits, Ms. Brown wrote a letter to the Appeals Council in which she retracted her previous statements. (R. at 285.) Ms. Brown indicated that her previous statement was "not factual" and cited her own "[d]epression, grievance and jealousy" as the reason that she wrote the statements. (R. at 285.) Ms. Brown was regretful for submitting a "mean, evil" report. (R. at 285.)

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 8, 2006, alleging an onset date of August 15, 2005. (R. at 12.) The claims were twice denied. (R. at 12.) On December 11, 2007, the ALJ issued a decision denying Plaintiff's claims. (R. at 12.) On May 4, 2009, the Appeals Council denied the Plaintiff's request for review of the ALJ's decision, rendering it the Commissioner's final decision. (R. at 12.)

Plaintiff then filed an application for DIB, alleging an amended onset date of December 12, 2007, the date after the ALJ's decision. (R. at 12.) The claim concerned whether Plaintiff was disabled after December 12, 2007, and whether Plaintiff's previous claims were barred by *res judicata*. (R. at 12.) Plaintiff's DIB claim was initially denied on September 28, 2009, and upon reconsideration on March 12, 2010. (R. at 12.) The ALJ denied Plaintiff's DIB claim on March 15, 2011. (R. at 12.) On August 20, 2012, the Appeals Council denied Plaintiff's request for review. (R. at 1.)

### III.    QUESTIONS PRESENTED

1.  Does the evidence submitted by Plaintiff in support of her motion for summary judgment meet the requirements for remand to the ALJ under the Act?

2.  Does the evidence submitted to the Appeals Council after the ALJ issued a decision unfavorable to Plaintiff meet the requirements for a remand under the Act?

3.  Does substantial evidence exist to support the ALJ's determination that Plaintiff could perform limited sedentary work?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chatter*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial

evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Maestro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[4] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

---

[4] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[5] based on an assessment of the claimant's residual functioning capacity ("RFC")[6] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock*, 667 F.3d at 472-73; *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S.

---

[5]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[6]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

at 146, n.5).  The Commissioner can carry his burden in the final step with the testimony of a Vocational Expert ("VE").  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V.      ANALYSIS

### A.      The ALJ's Opinion

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since December 12, 2007, the amended alleged onset date.  (R. at 15.)  At step two, the ALJ determined that Plaintiff was severely impaired from bilateral carpal tunnel syndrome, DeQuervain's tenosynovitis, hepatitis C, asthma and depression.  (R. at 15.)  At step three, the ALJ concluded that Plaintiff's impairments did not meet the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  (R. at 12.)

At step four, the ALJ determined that the Plaintiff was unable to perform her past relevant work.  (R. at 22.)  However, the ALJ found that Plaintiff maintained the RFC to perform sedentary work, but that she was limited to occasional stooping, squatting, crawling and kneeling (R. at 17.)  Plaintiff must be allowed to sit with the option to stand briefly in place three or four times an hour, must avoid heights, steps, hazardous or moving material, and more than occasional exposure to environmental or temperature extremes.  (R. at 17.)  Plaintiff is limited to

understanding, remembering and carrying out simple instructions. (R. at 17.) She is limited to minimal or no overhead reaching, but she is able to handle and finger frequently at times, but never repetitively. (R. at 17.) At step five, the ALJ determined that jobs exist in significant numbers in the national economy that the Plaintiff could perform. (R. at 23.)

Plaintiff now argues that she is disabled and she provided new evidence in support of her position. (Pl.'s Mem at 1-2.) Defendant responds that substantial evidence supports the ALJ's determination that Plaintiff could perform sedentary work after December 12, 2007, and therefore she is not disabled. (Def.'s Mot. for Summ. Judgment and Mem. in Supp. ("Def.'s Mem") (ECF No. 12.) at 22-27.) Further, Defendant argues that Plaintiff's additional evidence is not material so as to require a remand under the Act. (Def.'s Mem. at 17-21.)

B. Plaintiff's evidence submitted to the Court by Plaintiff in support of the motion for summary judgment does not meet the requirements to warrant a remand of the ALJ's decision.

Plaintiff submitted a recent medical absence report and an updated disability status from her physician in support of her motion for summary judgment. (Pl.'s Mem. at Ex. 1.) Defendant contends that such new evidence does not meet the requirements for a remand of the ALJ's decision under the Act. (Def.'s Mem. at 20.)

In determining whether the ALJ's decision was supported by substantial evidence, a court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (internal citations omitted). However, a "sentence six" remand provides that a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)

(a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence). Because Plaintiff has offered new evidence as an attachment in support of her motion for summary judgment, the Court will address whether Plaintiff has fulfilled the requirements to justify a "sentence six" remand.

Regarding Plaintiff's Medical Absence Report from Dr. Joseph dated February 27, 2006, such cannot be considered new evidence for remand purposes as the report is not new under the Act, because it was available at the time that the ALJ rendered his decision on March 15, 2011. While Plaintiff argues that her lawyers, not she, failed to provide the information to the ALJ for consideration (Pl.'s Response (ECF No. 13) at 1), such a reason does not constitute good cause for the failure to submit the evidence. *Benton v. Astrue*, 2010 WL 3419276, at *4 (D.S.C. Apr. 28, 2010) (finding that attorney error does not establish good cause for purposes of a Sentence Six remand). Therefore, Plaintiff's submission of the Medical Absence Report does not constitute new evidence and, therefore, cannot be a basis to remand the case to the ALJ for consideration of the report.

Plaintiff's submission of medical forms completed by Dr. Hearst on October 31, 2012 also fails to qualify as new evidence that requires a remand. New evidence must relate to the determination of disability at the time that the application was first filed, and it must not concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3d Cir.

1984) (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982)).  Evidence must also be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him.  *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted).

Plaintiff submitted medical records dated October 31, 2012.  While the record indicated that Plaintiff was restricted from prolonged standing or walking, (Pl.'s Mem. at Ex. 1.), these forms were nonetheless dated after the ALJ's March 15, 2011 decision.  These records indicate only a "subsequent deterioration of the previously non-disabling condition," *Szubak*, 745 F.2d at 833, and do not merit a "sentence six" remand, because they do not concern a new disability.

If anything, these records are cumulative and support the ALJ's determination that Plaintiff maintained the RFC to perform sedentary work.  "Jobs are sedentary if walking and standing are required occasionally."  20 C.F.R. §§ 404.1567(a).  Dr. Hearst's opinion lists Plaintiff's only restriction as no prolonged standing or walking.  Therefore, the records from Dr. Hearst provided by Plaintiff do not establish new evidence that require a remand under the Act.

C.  Evidence submitted by Plaintiff to the Appeals Council after the ALJ issued an opinion unfavorable to Plaintiff does not meet the requirements to warrant a remand under the Act.

Plaintiff's sister, Vanessa Brown, submitted additional evidence to the Appeals Council on behalf of Plaintiff's case after the ALJ issued his decision unfavorable to Plaintiff.  Defendant contends that the submission does not meet the requirements of new evidence that requires a remand of the ALJ's decision under the Act.  (Def.'s Mem. at 19.)

A "sentence four" remand provides that a "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g). If new evidence was submitted to the Appeals Council, the evidence must be new and material for a case to be remanded to the ALJ. *Wilkins v. Sec'y Dept. of Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991). New evidence is not duplicative or cumulative. *Id.* at 96. Evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Id.*

The ALJ issued an opinion denying Plaintiff's request for benefits on March 15, 2011. (R. at 24.) On April 21, 2011, Ms. Brown wrote a letter to the Appeals Council in which she retracted the statements that she made in her July 9, 2009 Third Party Function Report on the basis that the previous claims were not factual and were given out of spite. (R. at 285.) In his March 15, 2011, the ALJ "fully considered" Ms. Brown's report, but gave the statements little weight in making his decision, because of the "nature of the remarks." (R. at 18.)

Because of the little weight that the ALJ afforded to Ms. Brown's later retracted statements, the statements had little impact on the ALJ's decision. Therefore, the letter in which Ms. Brown retracted those statements would not provide a different outcome to the ALJ's decision. As such, Ms. Brown's April 21, 2011 retraction letter is not material and does not constitute new evidence that requires a remand for the ALJ's consideration.

> D.      Substantial evidence supports the ALJ's determination that Plaintiff maintained the RFC to perform sedentary work.

Plaintiff argues that the ALJ erred in finding that she was not disabled. (Pl.'s Mem. at 2.) Defendant responds that substantial evidence supports the ALJ's determination that Plaintiff is not disabled and can perform sedentary work. (Def.'s Mem. at 22.) Here, the ALJ determined that Plaintiff maintained the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) with the following limitations:

[Plaintiff] is limited to occasional stooping, squatting, crawling and kneeling. She must be allowed to sit with the option to stand in place briefly three or four times per hour in place. She must avoid heights, a few steps, and hazardous or moving machinery, and more than occasional exposure to environmental or temperature extremes. From a mental standpoint, she is able to understand, remember and carry out simple instructions. She is limited to minimal or no overhead reaching, but she is able to reach, handle and finger frequently at times, but not on a repetitive basis.

(R. at 17.) Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a); 20 C.F.R. §416.967(a). "Jobs are sedentary if walking and standing are required occasionally." *Id.* Substantial evidence supports the ALJ's determination regarding Plaintiff's RFC and limitations.

Regarding Plaintiff's physical limitations, Dr. Feild opined that after his September 18, 2009 examination of Plaintiff that Plaintiff could walk or stand four hours during an eight-hour workday with normal breaks and sit for less than four hours in an eight-hour workday. (R.at 400-01.) Plaintiff needed no assistive device to walk. (R. at 401.) During the appointment, Plaintiff exhibited no difficulty in getting on and off Dr. Feild's examination table. (R. at 400.) In an addendum to his previous report, Dr. Feild explained that Plaintiff suffered no decreased range of motion in her shoulders, elbows, wrists, hands or fingers. (R. at 405.) He opined that Plaintiff could stand or walk and sit for six to eight hours during a normal workday. (R. at 405.) He further noted that Plaintiff maintained the ability to lift ten pounds occasionally. (R. at 405.)

During Plaintiff's April 15, 2008 appointment with Dr. Chang, Plaintiff indicated that she felt much better. (R. at 332.) Plaintiff complained of pain in both hands, wrists and arms on multiple occasions and indicated that she could not work because of her carpal tunnel syndrome, but she refused to undergo surgery for her carpal tunnel. (R. at 316, 329-330, 359.)

The state agency physicians' opinions also support the ALJ's determination regarding Plaintiff's physical RFC and limitations. Dr. Chaplin and Dr. Vihn opined that Plaintiff maintained the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand or walk and sit with normal breaks for about six hours in an eight-hour work day. (R. at 90, 123.) Drs. Chaplin and Vihn indicated that Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and she was unlimited in her ability to handle, finger or feel. (R. at 90-91, 123.) They noted that Plaintiff was limited in her ability to reach right overhead. (R. at 91, 124.) Dr. Chaplin noted that Plaintiff should avoid concentrated exposure to extreme heat, humidity and fumes, odors, dusts, gases and poor ventilation. (R. at 90-91.) Dr. Vinh indicated that Plaintiff had no environmental limitations. (R. at 124.)

Plaintiff herself testified that, while seated, she needed to get up about three or four times per hour. (R. at 42-43.) In her Function Report, Plaintiff noted that she did laundry once a week and vacuumed three times per week. (R. at 244.) Plaintiff spent her days cleaning and cooking when she was able to do so. (R. at 242.) She shopped in stores monthly and went to church on a regular basis. (R. at 245-46.) Plaintiff marked that her condition did not affect her ability to squat, bend, stand, sit, kneel or climb stairs. (R. at 247.) Therefore, substantial evidence exists to support the ALJ's determination that Plaintiff was physically capable to perform sedentary work with the above limitations.

Regarding the mental limitations to Plaintiff's RFC, substantial evidence supports the ALJ's finding. Specifically, on July 21, 2009, Dr. Brown opined that Plaintiff was mentally capable of performing simple and complex tasks. (R. at 391.) Dr. Brown noticed that Plaintiff demonstrated good personal hygiene and wore age appropriate clothing. (R. at 388.) Dr. Brown noted that Plaintiff's recollection of events was consistent with that of a person who is of at least

average intelligence. (R. at 388.) Plaintiff denied experiencing any hallucinations, delusions, paranoia, obsessive compulsions or phobias. (R. at 388.) On December 6, 2010, Dr. Heylinger found no limitations in Plaintiff's ability to be aware of normal hazards and take appropriate precautions or travel to unfamiliar places or use public transportation. (R. at 463.) Dr. Heylinger determined that Plaintiff's condition was treatable, but Plaintiff failed to comply with her therapy appointments. (R. at 463.) During her January 17, 2011 appointment, Plaintiff appeared less depressed. (R. at 468.)

Drs. Saxby and Oritt, state agency psychologists, after reviewing Plaintiff's records performed mental residual capacity assessments of Plaintiff's condition in which they determined that Plaintiff was not significantly limited in her ability to carry out very short, simple instructions, carry out detailed instructions, make simple work related decisions, interact appropriately with the general public and ask simple questions or request assistance. (R. at 92-93.)

Plaintiff herself testified that she watched television and could follow the plot of the shows and could also follow the sermon at church. (R. at 49.) In her Function Report, Plaintiff noted that she needed no reminders to take care of her personal needs. (R. at 244.) Plaintiff marked that she could count change, but would probably be able to pay her bills if her husband could not. (R. at 59, 245.) Plaintiff listed her hobbies as watching television daily and putting together puzzles. (R. at 246.) She spent time with others talking, watching movies and having dinner. (R. at 246.) Her family and neighbors visited about three times a month and Plaintiff attended church on a regular basis. (R. at 246.) Plaintiff indicated that she was fair at following written instructions. (R. at 247.) She had no problem getting along with authority figures and was never fired from a job for failing to get along with others. (R. at 248.) Plaintiff was fair at

handling changes in her routine. (R. at 248.) As such, the ALJ's determination regarding Plaintiff's mental RFC and limitations is supported by substantial evidence.

Because substantial evidence supports the ALJ's determination of Plaintiff's RFC, the ALJ did not err in finding that Plaintiff maintained the ability to perform limited sedentary work. A finding, like the ALJ's decision here, that Plaintiff can perform less than a full range of sedentary work does not necessarily render a conclusion of Plaintiff being disabled. SSR 96-9p.

VI.    CONCLUSION

For the reasons set forth above, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                        /s/
                              David J. Novak
                              United States Magistrate Judge

Richmond, Virginia
Date: July 2, 2013

30